TRENTON H. NORRIS (SBN 164781)
PEG CAREW TOLEDO (SBN 181227)
WILLIS M. WAGNER (SBN 310900)
Arnold & Porter Kaye Scholer LLP
Three Embarcadero Center, 10th Floor
San Francisco, California 94111
Telephone: +1 415.471.3100
Facsimile: +1 415.471.3400
E-mail: Trent.Norris@arnoldporter.com
        Peg.Toledo@arnoldporter.com
        Will.Wagner@arnoldporter.com

ELDON MCAFEE (*pro hac vice*)
JULIE VYSKOCIL(*pro hac vice*)
BRICK GENTRY, P.C.
6701 Westown Parkway, Suite 100
West Des Moines, Iowa 50266
Telephone: 515.271.5916
Facsimile: 515.274.1488
E-mail: eldon.mcafee@brickgentrylaw.com
        julie.vyskocil@brickgentrylaw.com

MARNIE A. JENSEN (*pro hac vice*)
RYANN A. GLENN (*pro hac vice*)
Husch Blackwell LLP
13330 California Street, Suite 200
Omaha, Nebraska 68154
Telephone: 402.964.5000
Facsimile: 402.964.5050
E-mail: marnie.jensen@huschblackwell.com
        ryann.glenn@huschblackwell.com

Attorneys for Plaintiff
IOWA PORK PRODUCERS ASSOCIATION

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IOWA PORK PRODUCERS ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, in his official capacity as Attorney General of California, KAREN ROSS, in her official capacity as Secretary of the California Department of Food and Agriculture, and TOMAS ARAGON, in his official capacity as Director of the California Department of Public Health,<br><br>Defendants. | Case No.  1:21-cv-01663<br><br>**FIRST AMENDED VERIFIED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF**<br><br>Unlimited Civil Case<br><br>Dept.:<br>Judge:<br>Trial Date:  Not Assigned<br><br>Action Filed: |

1

Plaintiff Iowa Pork Producers Association, in a representative capacity for its members, ("IPPA" or "Plaintiff"), by and through its counsel of record, for its First Amended Complaint for Declaratory and Injunctive Relief against Defendants Rob Bonta, in his official capacity as Attorney General of California ("Bonta"), Karen Ross, in her official capacity as Secretary of the California Department of Food and Agriculture ("Ross"), and Tomas Aragon, in his official capacity as Director of the California Department of Public Health ("Aragon") (collectively, "Defendants"), respectfully states to the Court as follows:

## **INTRODUCTION**

1.      This case challenges the constitutionality of California's Proposition 12 Farm Animal Confinement Initiative ("Proposition 12" or "Prop 12" or the "Act"), which imposes confinement requirements on out-of-state pork producers and prohibits the sale of pork meat within the state of California from animals confined in a manner inconsistent with California's requirements, regardless of where in the nation the animal was raised.

2.      Proposition 12 poses a current and imminent risk of criminal prosecution and civil enforcement against Plaintiff's members, as the Act imposes both criminal and civil penalties on any non-compliant business owner or operator who is "engaged in the sale" of whole pork meat within California.

3.      Iowa, where Plaintiff and its members are located, is the largest pork producing state in the United States and is the leading state for pork exports.

4.      California residents consume an estimated 13-15% of the overall national pork consumption in the U.S.

5.      Despite its behemoth status as a consumer of pork, California has as few as 8,000 breeding pigs in the entire state. Only approximately 1,500 of these breeding pigs are used in commercial breeding in the state and are situated in a handful of very small farms. This equates to

2

California production making up less than 1% of the total U.S. pork production. If California were to meet its own in-state pork demand, it would require production from approximately 673,000 breeding pigs annually. In other words, California cannot feed itself without massive agricultural imports from other states, including, most importantly, from Iowa and Plaintiff's members.

6.     On November 6, 2008, California voters passed Proposition 2.  Proposition 2 created confinement requirements for in-state producers in California.  Proposition 2 required that breeding pigs in California be housed in a manner that permits the animals to "turn around freely, lie down, stand up, and fully extend their limbs," subject to limited exceptions (the "Turn Around Requirements").  Prop 2 provided in-state producers more than six years to comply with the Turn Around Requirements, as the effective date was set at January 1, 2015.

7.     On November 6, 2018, California voters passed Proposition 12 and extended these Turn Around Requirements that California producers were now in compliance with to be effective upon out-of-state producers, making them effective on December 19, 2018.  This gave the rest of the country's pork producers only six *weeks* to comply with the same requirements that California had provided over six years to in-state-producers.

8.     Proposition 12 also added a second requirement, the square footage requirements, and specified an effective date of "after December 31, 2021" for breeding pigs.  These separate requirements state that a breeding pig must be provided with at least 24 square feet of usable floorspace per pig (the "Square Footage Requirements").

9.     Recognizing the vagueness of the Act, Proposition 12 required that California's Department of Food and Agriculture ("CDFA") and Department of Public Health ("CDPH") jointly promulgate rules and regulations to implement Proposition 12 and provide adequate notice of compliance requirements to those subject to Proposition 12 by September 1, 2019 ("Final Regulations").

AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

10.     However, while Proposition 12 mandated Final Regulations for the *entirety* of the Act, the December 19, 2018 effective date of the Turn Around Requirements was immediate and left no time for the CDFA and CDPH to promulgate the Final Regulations and certainly no time for out-of-state producers to comply.

11.     Further, Proposition 12's mandated deadline of September 19, 2019 for the Final Regulations passed without even draft regulations issued, let alone Final Regulations.

12.     Just this year, on May 28, 2021, the CDFA finally published draft rules and regulations to consider for Proposition 12, one year and nine months past the voters' statutory deadline (the "Proposed Regulations").

13.     Proposition 12 allows for criminal and civil penalties for any person found to be in violation of either the Turn Around Requirements or the Square Footage Requirements, or any provisions of the Act, including criminal misdemeanor convictions, with penalties of a fine of up to $1,000 or 180 days imprisonment.   These criminal penalties can be assessed against both business owners and operators who are non-compliant with Proposition 12 who choose to "engage in a sale" of non-compliant pork meat within California.

14.     It will take years and cost at least tens of millions of dollars for Plaintiff's members to come into compliance with Proposition 12's Final Regulations once they are finally known.

15.     In the meantime – and even according to Defendants – any district attorney or local prosecutor in the state of California, in addition to the Attorney General's Office, can prosecute Proposition 12 now even without the Final Regulations and without leaving the industry any time to comply.  Owners, operators – and anyone who "aids and abets" or "conspires" with them within the food chain, is at imminent risk for criminal prosecution.

16.     Proposition 12's Turn Around Requirements and Square Footage Requirements are inconsistent with pork industry practices and standards, generations of producer experience,

scientific research, and the consensus standards of other states. Proposition 12 will impose costly mandates that substantially interfere with commerce among the states in hogs and whole pork meat markets. It will impose enormous costs on Iowa pork producers, ultimately having a direct impact on the price of pork for all Americans, the vast majority of whom had no say in Proposition 12.

17.     Most breeding pigs that will produce hogs sold as meat product in 2022 *are already alive* at Iowa farms. The breeding cycle of the pigs is four months, followed by the piglets being raised for three to four weeks before they are weaned and ultimately, farrow to finish takes approximately 24-26 weeks.

18.     Proposition 12 will force the unnecessary slaughter of these breeding pigs, the same pigs that California voters were told Proposition 12 will help.

19.     Through Proposition 12, California seeks to unilaterally impose sweeping changes across the national pork production industry and subject out-of-state individuals in the production market to criminal penalties. Currently, an estimated 4% of pork producers nationwide could satisfy California's onerous standards. California also cannot meet its state's pork demand or feed itself. Due to the proportion of the national pork supply destined for California—and the significant integration and coordination of national pork production and distribution system—it is neither feasible nor practical for producers to segregate their product from California markets. Not selling to California is not an option. As a result, California has attempted to create a national regulation on breeding pig housing through the passage of Proposition 12.

20.     Proposition 12's assertion that non-compliant pork meat "threatens the health and safety of California consumers, and increases the risk of foodborne illness" is false and inconsistent with scientific studies surrounding housing breeding pigs in group pen settings.   In fact, by California's own admission, Proposition 12 provides no real health or safety benefit to residents.

*See* 2021 CA REG TEXT 584571 (NS) at 6, 11 ("This proposal does not directly impact human health and welfare of California residents, worker safety, or the State's environment.").

21.     Within the Standardized Regulatory Impact Assessment (the "SRIA") of Proposition 12, it was confirmed there is no conclusive, scientific link between animal housing space allocation and human food-borne illness, or other human health or safety.

22.     Economic research indicates implementation of Proposition 12 will actually have *adverse* fiscal impacts on residents in California. California residents comprise a large market of pork consumers who will face higher pork prices following implementation of Proposition 12. Thus, any alleged negative fiscal impact that led to the passage of Proposition 12 lacks support.

23.     Currently in the United States, an estimated 42 million people may experience food insecurity in 2021. Pork ranks third in the United States for meat consumption. Proposition 12 threatens to significantly increase the cost of pork for consumers, which will make it even more difficult for economically-distressed families and those already facing food insecurity to afford this critical source of protein.

24.     Proposition 12 also threatens the public supply of pork within California, which is necessary to satisfy the needs of the businesses and state facilities, including hospitals, schools, and prisons.

25.     Without immediate and permanent injunctive relief from this Court, Proposition 12 will unconstitutionally and irreparably risk and injure breeding pigs, piglets, and Iowa pork producers, their livelihoods, liberty and their property.

## **PARTIES**

26.     Plaintiff IPPA serves as a unified voice for its Iowa pork producer members. It is a grassroots organization that consists of approximately 70 structured county associations across the state, with more than 4,000 affiliated and associate members that are overwhelmingly individual

6

producers. Every producer-member, regardless of size, has a voice in IPPA through a county-elected delegate system. IPPA has members in nearly every county within Iowa.

27.     Plaintiff's members produce the whole pork that their processors and packers sell directly into California.

28.     Defendant Bonta is the Attorney General of the State of California.   Bonta is responsible for the enforcement of Proposition 12 and is sued in his official capacity only.

29.     Defendant Ross is the Secretary of the California Department of Food and Agriculture, which is responsible for implementation of Proposition 12.  Ross is sued in her official capacity only.

30.     Defendant Aragon is the Director of the California Department of Public Health, which is responsible for implementation of Proposition 12.  Aragon is sued in his official capacity only.

## JURISDICTION AND VENUE

31.     This Court has jurisdiction over this complaint for declaratory and injunctive relief pursuant to sections 525, 526, and 1060 of the California Code of Civil Procedure.

32.     The Court has authority to enjoin enforcement of Proposition 12's sales ban under 42 U.S.C. § 1983 and state law.

33.     Venue is proper in this county pursuant to sections 395 and 401 of the California Code of Civil Procedure because this is an action against the State, or a department, officer or other agency thereof, that may be commenced in the County of Sacramento, and therefore may also be commenced in any county in which the California Attorney General has an office. The California Attorney General has an office in this county.

AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

## BACKGROUND ON PROPOSITION 12

34.    In 2008, California enacted California Health and Safety Code Section 25990 through ballot initiative Proposition 2, for California *in-state* pork producers to require breeding pigs in California be housed in a manner that permitted the animals to "turn around freely, lie down, stand up, and fully extend their limbs," subject to limited exceptions known as the Turn Around Requirements.

35.    Proposition 2 provided in-state producers more than six years to comply with these Turn Around Requirements, as the requirements did not go into effect for California in-state pork producers and packers until January 1, 2015.  Cal. Health & Safety Code § 25990(a).

36.    On November 6, 2018, California enacted another amendment to California Health and Safety Code Section 25990-25993 through ballot initiative, Proposition 12.  Proposition 12, in stark contrast to the time allowed for California in-state producers and packers, went into effect just six *weeks* later on December 19, 2018 for out-of-state producers.  Cal. Health & Safety Code §§ 25990(a) – 25994.

37.    The California Constitution, Article II, Section 10, provides that unless a statute otherwise specifies a date, a ballot initiative "takes effect on the fifth day after the Secretary of State files the statement of the vote for the election at which the measure is voted on, but the measure may provide that it becomes operative after its effective date."  According to the Defendants, Proposition 12's Turn Around Requirements do not have a separately specified effective date and the Turn Around Requirements went into effect December 19, 2018 and are in effect now.  Cal. Health & Safety Code § 25991(e)(1).

38.    After California allowed over six years for their own in-state producers and packers to comply, for the first time, California's Turn Around Requirements were *immediately* imposed upon the entire out-of-state industry to sell whole pork meat within the state of California,

8

regardless of where the hog was raised and regardless of providing the pork industry almost no time to comply.  It immediately became a crime for the Plaintiff's members –and the out-of-state pork industry to sell into California.

39.     Proposition 12 also added a second set of requirements, the Square Footage Requirements, and specified an effective date of "after December 31, 2021."  These separate requirements state that a breeding pig must be provided with at least 24 square feet of usable floorspace per pig. Cal. Health & Safety Code § 25991(e)(3).

40.     The limited exceptions as applicable here include only the five-day period prior to the expected date of giving birth, during nursing, and for only temporary periods of less than six hours for breeding purposes. Cal. Health & Safety Code § 25992.

41.     Proposition 12 is both a criminal and civil statute. The statute imposes criminal exposure on any person found to be in violation of either the Turn Around Requirements or the Square Footage Requirements, or any provisions of the Act, including penalties against individuals and entities for criminal misdemeanor convictions, a fine of up to $1,000 and/or 180 days imprisonment. Cal. Health & Safety Code § 25993.

42.     These criminal penalties can be assessed against both business owners and operators who are non-compliant with Proposition 12 who choose to "engage in a sale" of pork meat into California. Cal. Health & Safety Code § 25990(a) and (b)(2).

43.     The California Penal Code further permits prosecution of individuals outside the state of California who aid and abet those engaged in the sale of meat in violation of Proposition 12.  Under, California Penal Code Section 27(a)(1), "being without this state, cause or aid, advise or encourage, another person to commit a crime within [California], and are afterwards found therein" … "are liable to punishment under the laws of [California]."  Under California Penal Code

AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

Section 31, any person aiding and abetting in the commission of a misdemeanor may be charged as a principal of the crime.

44.     The California Penal Code also permits prosecution of individuals outside the state of California who conspire with those engaged in the sale of meat in violation of Proposition 12. Under California Penal Code Section 181, if two or more persons conspire to commit "any act injurious to the public health, the public morals … or the due administration of the laws" they could be punished by imprisonment in county jail for up to one year or by a fine not exceeding $10,000 or by both the imprisonment and fine.

45.     Under California Penal Code Section 184, "[n]o agreement amounts to a conspiracy, unless some act, beside such agreement, be done within [California] to effect the object thereof, by one or more of the parties to such agreement . . .."

46.     Proposition 12 does not define what it means for an individual to be "engaged in" a sale within the State of California, and by Proposition 12's plain language, an out-of-state producer is potentially subject to criminal prosecution for being "engaged in" the chain of sale of non-compliant pork meat into the State of California. Cal. Health & Safety Code § 25990(a) and (b)(2).

47.     Facilities and housing conditions for breeding pigs and piglets are complex animal care conditions and based on years of continuous scientific improvement.  Proposition 12 does not define what it means for facilities to comply with one or either of the two requirements.

48.     Proposition 12 does not clearly define whether the requirements apply to the life of the breeding pig or whether moving a breeding pig to a new compliant facility will suffice for the production of compliant whole pork for sale into California.

49.     Further, Proposition 12 does not define what qualifies as specific violation of the Act. For example, it remains vague as to whether a single violation is based on each sale, each pound or piece of meat, or each breeding pig.

AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

50.     Due to the vagueness of these requirements in the Proposition 12 statute – and the nuances of the appliable exceptions – Proposition 12 mandated that "the Department of Food and Agriculture and the State Department of Public Health shall jointly promulgate rules and regulations for the implementation of this act by September 1, 2019." Cal. Health & Safety Code § 25993.

51.     Additionally, the sale of non-compliant pork meat qualifies as unfair competition, as defined in Section 17200 of the Business and Professions Code, and is punishable as prescribed in Chapter 5 (commencing with Section 17200) of Part 2 of Division 7 of the Business and Professions Code.  It provides violators are separately subject to a $2,500 fine per violation under the state Consumer Protection Act. Cal. Health & Safety Code § 25993.

52.     Unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code. Cal. Bus. & Prof. Code § 17200.

53.     The California Business and Professions Code permits the California attorney general, any district attorney, county counsel, city attorney, city prosecutor, and even *any person* who can meet standing requirements to file a lawsuit to enforce the provisions of the chapter.  Cal. Bus. & Prof. Code § 17203.

54.     While Proposition 12 mandated Final Regulations for the Act, the Turn Around Requirements' effective date of December 19, 2018 was immediate and left no time for the CDFA and CDPH to promulgate the rules and regulations, let alone time for Plaintiff's members or the out-of-state pork industry to comply.

55.     Proposition 12's mandated deadline of September 1, 2019 for the Final Regulations passed without even *draft* rules or regulations published, let alone Final Regulations.

11

56.     On March 5, 2021 of this year, CDFA issued FAQs to the public. *See* CDFA AHFSS Animal Care Program Prop 112 FAQ, (March 5, 2021), https://www.cdfa.ca.gov/AHFSS/pdfs/Prop_12_FAQ_March_2021.pdf. These FAQs did not address the most material questions by Plaintiffs or the industry ("CDFA FAQs").  The short document failed to provide any guidance needed for compliance with Proposition 12.

57.     Within the CDFA FAQs, a question was posed regarding potential sell through of whole pork meat that was non-compliant with the Square Footage Requirements.  CDFA stated that because the effective date of the Square Footage Requirements goes into effect on January 1, 2022, pork meat in inventory or commerce on December 31, 2021 would be legal to sell in California. However, this month CDFA has consistently said to the public that their position, like their FAQ answer, only applies to the Square Footage Requirements and that whole pork meat cannot be sold into California now or after January 1, 2022 that is not incompliance with the Turn Around Requirements as of December 19, 2018.  This requirement renders all current whole pork meat for out-of-state producers non-compliant, not even allowing legal sell through for current pigs born prior to January 1, 2022, currently alive on farms or within the supply chain.

58.     One year and nine months past the statutory deadline, just this year, on May 28, 2021, the CDFA published the Proposed Regulations to consider for Proposition 12.

59.     Defendants published the Revised Regulations on December 3, 2021 that they have characterized as "not substantial" changes to the Proposed Regulations that were published May 28, 2021. The Revised Proposed Regulations are subject to a fifteen (15) day public written comment period and no opportunity for public hearing has been provided. The earliest date the Revised Proposed Regulations will be *effective and enforceable* is April 1, 2022.

60.     In the meantime, the threat of enforcement of the Act remains and is imminent, as any district attorney, local prosecutor or the Attorney General's office, can criminally indict those

12

AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

selling – or involved in the food supply chain selling – into California. Further, the risk of civil enforcement and private party claims under the California Business & Professions Code also are imminent risks. On information and belief, no statutory enforcer of Proposition 12 has disclaimed its authority or ability to initiate criminal or civil actions.

61.     Even the Proposed and Revised Regulations demonstrate the discriminatory intent of Defendants as they threaten to impose onerous registration and certification requirements on out-of-state producers and directly regulate extraterritorial conduct. For example,  California has made clear that it intends to require out-of-state producers to comply with certification requirements through private third-party certifiers, and to keep up with recordkeeping and reporting requirements including annual distributor registration and renewal forms submitted to the department in order to sell into the state. *See* 2021 CA REG TEXT 584571 (NS) at 13.

62.     Not only are out-of-state producers required to comply with registration and certification requirements according to the current Revised Regulations, but any producer wishing to sell into the state will be subject to the Departments' "routine and risk-based audits and inspections of farms." This means that California currently plans to have California state officials or direct third-party certifiers go on to out-of-state farms to ensure that they are in compliance with Proposition 12.

63.     Proposition 12's vague language and CDFA and CDPH's failure to publish the Final Regulations, unquestionably leaves the law vague for any reasonable compliance by Plaintiff's members and anyone selling or supplying whole pork for sale into California.

64.     Because California producers were already required to comply with the Turn Around Requirements since the passage of Proposition 2, Proposition 12 targeted and applied Turn Around Requirements only for *out-of-state* producers.

AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

65.     The California Legislature recognized that out-of-state producers were at an advantage within the California market and thus enacted Assembly Bill 1437 ("AB1437") with the protectionist intent of leveling the playing field and imposing California's confinement requirements for egg-laying hens on out-of-state producers as well.

66.     AB1437 did *not* apply to pork meat.

67.     After AB1437 was enacted, California proposed Proposition 12, drafted and primarily sponsored by the Humane Society of the United States, which would, like AB1437, regulate pork produced outside of California and, for the first time, subject out-of-state pork producers to California's Turn Around Requirements for breeding pigs if the producer, business owner, or operator desired to sell whole pork meat into or within California.

68.     By California's own admission, if California did not impose Proposition 12's confinement requirements on out-of-state producers as well, in-state farms would "find it more costly to compete with farms outside of the state when selling…whole pork meat…" *See* 2021 CA REG TEXT 584571 (NS) at 10.

69.     Proposition 12 also unquestionably directly and intentionally targeted out-of-state activity, and directly regulates extraterritorial activity, both through the confinement, inspection, and registration requirements and by stifling interstate commerce through the prohibition of sale of non-compliant pork meat into and within California.

## IMMEDIATE IMPACTS OF PROPOSITION 12 ON THE IOWA PORK PRODUCTION INDUSTRY

70.     Nearly one-third of the nation's hogs are raised in Iowa—more than twice the amount of its runner up state—and Iowa has more than 5,400 hog farms, with producers in nearly every county.

71.     In 2020, Iowa sales for the pork industry including hog production totaled $40.8

14

billion. It also generated $893 million in state and local taxes and $1.3 billion in federal taxes.

72.     In 2020, Iowa had 960,000 breeding pigs and more than 22 million hogs and pigs total on Iowa farms.

73.     The Iowa hog inventory has been growing at a rate of 3% annually for the past decade, compared to a 2% growth rate nationally in the United States market.

74.     As of 2017, 45% of farming operations in Iowa are on farms with between 1,000 and 5,000 hogs and pigs.

75.     The number of smaller farming operations in Iowa has been dwindling since 1997.

76.      Nearly 150,000 jobs within Iowa are associated with the Iowa pork industry, and nearly 1 in 10 working Iowans have a job tied to the pork industry.

77.     Compliance with Proposition 12 requires significant and extremely costly changes to the farming operations of Iowa's pork producers, including Plaintiff's members.

78.     Sows are female pigs utilized for breeding and give birth to the piglets that ultimately become hogs sent to market. Sows are usually maintained on sow-specific farms that are commonly separated from other hog facilities, to prevent the spread of disease, for the safety of the sows, and to increase efficiency. Sows are generally artificially inseminated, litters of piglets are born, and the piglets are raised for three to four weeks before they are weaned.

79.     An overwhelming majority of sow farms use some type of indoor confinement for sow operations, utilizing the benefit of year-round production and protection from seasonal weather changes, disease exposure, and external predators.

80.     Only a small portion of the pigs that are harvested for meat are sows that have been kept for reproduction.

81.     Pursuant to decades of scientific research, industry practice is that the vast majority of all producers house pregnant sows in individual stalls for insemination, throughout pregnancy,

and for the first 30 to 40 days after weaning. This practice helps prevent pregnancy loss, critically permits the attachment of embryos, and guards against the high risk of loss of pregnancy caused by aggressive behavior that commonly occurs within larger pens or open/group housing.

82.     The individual stalls also permit sows to recover from weaning, experience reduced stress levels, and receive a proper amount of individualized nutrition at a time when they are vulnerable.

83.     Specifically, housing sows in individual stalls permits producers to carefully provide each sow with the right amount of feed to achieve optimal nutrition. This is difficult in a group housing system and is especially critical to maintain the appropriate body condition right after weaning.

84.     Housing sows in a group pen also threatens worker safety, given the large size of the animals and the need for farm hands to enter the pens with multiple 400-pound animals.

85.     Proposition 12 imposes restrictions that are contrary to current time-tested, science-based, best practices for pork production. Proposition 12, in practical effect, bans the use of individual stalls during breeding and most of the gestation period.

86.     Further, one interpretation of Proposition 12 means that, after December 31, 2021, Proposition 12 requires that each breeding pig must be allotted at least 24 square feet of usable floor space in the group pen, per pig, subject to limited exceptions.

87.     The offspring of sows are raised to market weight in separate, specialized production facilities, including: (1) feeder pig producers or nurseries; (2) feeder pig finishers; and (3) farrow-to-finish operations. Farrow to finish takes approximately 24-26 weeks.

88.     Once hogs reach harvest weight, they are sent to packing facilities throughout the country. Packing facilities receive hogs from multiple farms, in multiple locations, operated by multiple producers.

16

89.     A packing facility typically harvests thousands, or even tens of thousands, of hogs daily. Packers process the harvested pigs into whole pork cuts or send them to separate processing facilities. The meat is packed and delivered to wholesale or to large retail customers throughout the entire country and abroad.

90.     Pork product from one hog is cut into many different cuts of meat and shipped to many end users across the country and internationally.

91.     Thus, it is not currently possible to segregate only the pork meat that will ultimately make it to the California market, because packing facilities receive meat from producers nationally, and each hog is cut into many different cuts of meat.

92.     Further, this means that it would be impossible for certain producers to forego the California market because packing facilities cannot track which hogs came from producers complying with Proposition 12. Packing facilities cannot realistically track meat that should go to California, just as it cannot track which meat should not go to California. Practically speaking, this means that packing facilities will need to obtain either all Proposition 12-compliant meat or stop providing pork to California.

93.     Proposition 12 confinement restrictions would require significant changes to the vast majority of pork production operations throughout Iowa, including significant structural changes and the requirement to reduce the number of pigs at the facility. At this time, only an estimated 4% of breeding pigs in the United States are confined in a manner consistent with Proposition 12.

94.     Proposition 12 will also create negative impacts on the breeding pigs that are confined within a group pen, likely resulting in significant health risks and piglet loss.

95.     Group confinement requirements mandated by Proposition 12 create significant ongoing harm to breeding pigs.  Breeding pigs are subject to physical aggression, abuse, losing

fetuses in utero, lameness and the inability to obtain proper nutrition when confined in group systems.

96.     Due to not being able to build new barns or retrofit existing barns, it will not be feasible for many members to ever come into compliance with Proposition 12 requirements for a variety of reasons, including lack of space and financial inability. It is expected that smaller pork producers will be those unable to comply with Proposition 12, pushing smaller producers, which are often family farms, out of the industry. This will result in a consolidation of the industry into large producers and will significantly harm many small producers located in Iowa.

97.     Small farm operations are already threatened by bigger producers and small producers have been on the decline for the last twenty-five years. *See* Table, 2020 Iowa Pork Industry Report, May 2020, 21:



**Figure 18, Number of Iowa Hog Operations by Size (1997-2017)**

98.     Producers cannot realistically forego the California market, as the California market

AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

makes up 13-15% of the nation's pork consumption market. If forced to exit the California market, many farmers' operations will become cost prohibitive based on loss in revenue from California consumers. Any increased price of pork in California will not be sufficient to offset the cost to come into compliance with Proposition 12. This is because it is impossible to segregate which portions of meat will be sold into the California market alone.

99.    For the minority of producers who may be able to come into compliance, it is estimated that it will cost these producers an increase in capital costs of approximately 50% reflecting the shift from 16 to 24 square feet. Conservatively presuming changes in feed costs, labor costs, herd health, and other expenses besides capital costs, it has been estimated that costs overall would increase by 21% for farrowing operations in Iowa who convert production systems.

100.    In comparison, California producers who already converted sow housing to be compliant with Turn Around Requirements benefitted from the lead time allowed through implementation of Proposition 2. For example, the SRIA (2020) report admitted that California producers who must transition their operations from 20 (the average turn around stall) to 24 square feet only face a 4% increase in total costs and only a 20% increase in capital costs.

101.    Combining the cost of farrow-to-wean operations in Iowa of $33.59 per weaned pig, with the increased percentage costs for compliance with Proposition 12, a conservative estimate results in the cost of producing a weaned pig in Iowa compliant with Proposition 12 to increase by at least $7.05 per weaned pig.

102.    Considering the aggregate number of weaned pigs being 25 million per year in Iowa, this results in an annual approximate aggregate cost impact to Iowa pork producers of at least $176 million.

103.    This increased cost cannot be recovered from Defendants due to California's sovereign immunity, precluding the recovery of monetary damages by Plaintiff's members.

104.  Or, alternatively, to come into compliance, many producers will need to limit their supply so that their pigs will have more space, as many do not have the option to buy more real estate. This means that the national pork supply will drop.

## IMMEDIATE NATIONWIDE IMPACTS OF PROPOSITION 12 ON
## PORK PRODUCTION INDUSTRY

105.  Proposition 12's application to out-of-state producers will have a direct impact on nationwide pricing of pork, the national pork supply and consumers nationwide.

106.  The sale of whole pork meat is a nationwide, regulated commodity, which requires nationwide regulation rather than state-by-state mandates.

107.  The implementation and enforcement of Proposition 12 would result in higher pork prices for consumers nationwide and less pork being available for purchase.

108.  Annual consumer losses of over $34 million would occur across four California retail pork markets, in comparison to $303 million dollars in annual consumer losses across 47 examined U.S. markets outside of California, directly as a result of Proposition 12 being implemented.

109.  Even if producers were able to forego the California market, there would be drastic impacts on the nationwide pork industry and further irreparable harm to small pork producers. The remaining nation would need to absorb the additional supply of pork, which would result in a 25% reduction in farm receipts. Again, the smaller producers are most threatened, likely unable to sustain the losses and would be forever forced out of the market.

110.  Plaintiff's members are further at risk of being subject to conflicting laws throughout the remaining United States. The conduct that California seeks to prohibit actually occurs primarily out of state, and for the Plaintiff members, it occurs primarily in Iowa. Plaintiff members' sow housing is not subject to Turn Around Requirements or Square Footage Requirements in Iowa. As

20

a result, California is attempting to regulate sow confinement everywhere in the country because of the nature of the pork industry where pork processors are dividing cuts of a hog into multiple different cuts that are sent to multiple different locations nationwide. This necessarily creates a national regulation that invites inconsistent regulation of activities that are inherently national or require a uniform system of regulation.

111.   Thus, Plaintiff's members face immediate and irreparable harm if Proposition 12 continues to go into effect as planned and further enforced. Injunctive relief will remedy this harm.[1]

### STANDING

112.    IPPA brings this suit on behalf of its members.  Plaintiff's members have suffered, and will continue to suffer, concrete and particularized injuries that are a direct result of Proposition 12. Their injuries will be redressed by a decision of this Court.

113.   IPPA has associational standing to challenge Proposition 12 on behalf of its members and on behalf of the entity itself.

114.   One or more IPPA members has standing to bring this action in their own right. Thousands of IPPA members are directly subject to Proposition 12 because they breed or raise pigs that are being sold into and within California.

115.   The interests Plaintiff seeks to protect are germane to Plaintiff's mission statement and purpose.

116.   Individual participation by Plaintiff's members is not required for the claims asserted or the relief requested.

117.   Plaintiff's members supply pork to be sold into and within California, and expect to continue to do so after January 1, 2022. A criminal prosecution or enforcement by Defendants

---

[1] Plaintiff will separately file a Motion for Preliminary and Permanent Injunction following service on Defendants.

AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

against Plaintiff's members is not required to challenge the constitutionality of Proposition 12. A person or entity is not required to suffer the irreparable harm of being criminally accused and charged before raising a challenge to unconstitutionally vague law.

118.    The vast majority of Plaintiff's members are currently raising breeding pigs that do not meet Proposition 12's requirements.

119.    Plaintiff's members cannot realistically change the confinement of these breeding pigs to come into compliance with Proposition 12's Square Footage Requirements or Turn Around Requirements as required on or before December 31, 2021.

120.    In California, meat cannot be sold if it comes from a breeding pig that has been in confinement contrary to Proposition 12.

121.    Plaintiff's members thus face imminent and irreparable Hobson's choice of: (1) being forced to harvest their breeding pigs in order to enter the California market, which makes up 13-15% of the national market, (2) ceasing operations, or (3) being forced to forgo one of the largest pork consumption markets in the nation at crippling expense.

122.    California has admitted the Turn Around Requirements went into effect December 19, 2018, thereby creating immediate risk for criminal and civil prosecution for all of Plaintiff's members.

123.    Further, the entire national market for pork is threatened to be irreparably harmed if Proposition 12 goes into effect, with impacts on nationwide consumers who had no involvement in the passage of Proposition 12.

124.    These injuries will be remedied by the relief sought in this action.

# FIRST CAUSE OF ACTION

## VIOLATION OF THE DUE PROCESS CLAUSE (42 U.S.C. § 1983)

## (FACIAL AND AS APPLIED CHALLENGE)

125.    Plaintiff incorporates the facts set forth in Paragraph Nos. 1-124 as though fully set forth herein.

126.    Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiff, including by violating Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

127.    Proposition 12 violates the Due Process Clause because it is unconstitutionally vague on its face and criminalizes behavior without giving individuals of ordinary intelligence a reasonable opportunity to know what conduct is prohibited, so that they may act accordingly.

128.    Proposition 12 is also unconstitutionally vague as applied to Plaintiff's members' specific conduct in pig production, because under the plain text of the Act, it is unclear whether Plaintiff's members' specific actions are currently subject to criminal prosecution and penalties if their pork is sold into California.

129.    Proposition 12 does not define the conduct it prohibits with sufficient definiteness and does not establish minimum guidelines to govern law enforcement.

130.    Proposition 12 fails to define the material words and terminology in the statute so that Plaintiff's members and the pork industry can comply with the legal requirements and not inadvertently violate the law.

131.    For a statute to be unconstitutional for due process, a criminal prosecution or enforcement is not required, enforcement must just be imminent or the legal authority to enforce must be available to the law enforcement authorities.   A person and entity is not required to suffer the irreparable harm of being criminally accused and charged before raising a challenge to an

unconstitutionally vague law.

132.   Proposition 12 itself recognized the vagueness of the Act and mandated the CDFA and CDPH to jointly promulgate rules and regulations for the implementation of the Act by September 1, 2019.

133.   Proposition 12's mandate for the promulgation of the Final Regulations functions as its own admission of the vagueness of the Act.

134.   Because the Turn Around Requirements went into effect just six weeks after Proposition 12 passed by ballot imitative, CDFA and CDPH did not have time to promulgate the rules.

135.   Proposition 12's effective date of December 19, 2018 is contradictory to its own mandate to promulgate Final Regulations for the entirety of "this Act," i.e. *both* requirements of the Act, by December 19, 2018.

136.   Proposition 12's Turn Around Requirements went into immediate effect without giving the public, including the Plaintiff, an opportunity to be heard in the rule and regulation process.

137.   Proposition 12's Turn Around Requirements went into immediate effect without allowing time for compliance or time for the promulgation of the needed rules to cure the underlying vague statute so that out-of-state producers could comply.

138.   The CDFA and CDPH further failed to implement the mandated rules and regulations by the Act's deadline September 1, 2019.

139.   On January 1, 2022, just weeks away, the Square Footage Requirements will go into effect without the Final Regulations to cure the unconstitutionally vague Act.

140.   Proposition 12 is a criminal statute. The text of Proposition 12 provides that "any person who violates any of the provisions of this chapter is guilty of a misdemeanor" and subjects

those persons upon conviction to a fine of up to $1,000 or by imprisonment for a period not to exceed 180 days.

141.    Proposition 12 threatens to criminally punish conduct in which the Plaintiff's members are engaged.

142.    California aiding, abetting and conspiracy statutes further extend the enforcement capabilities of the Act to unknown persons and parties.

143.    The current Revised Regulations, at a minimum, make clear of Defendants' intent to reach well into the supply chain and down into the farms of the Plaintiff's members, directly reaching beyond its borders.

144.    Any district attorney, local prosecutor or the Attorney General's Office can enforce Proposition 12.  CDFA itself has warned of this imminent risk of prosecution and enforcement by law enforcement agencies, despite the Final Regulations not yet being issued.

145.    Defendant CDFA has no control over these enforcement agencies who have authority under the Act for enforcement of Proposition 12.

146.    Further, Defendant CDFA's Animal Care Program (ACP), which was formed to implement Proposition 12, issued FAQs on March 5, 2021, *See* CDFA AHFSS Animal Care Program Prop 112 FAQ, (March 5, 2021), https://www.cdfa.ca.gov/AHFSS/pdfs/Prop_12_FAQ_March_2021.pdf.  Within the FAQs, a question was posed regarding potential sell through of whole pork meat that was non-compliant with the Square Footage Requirements. It states, Q. "Will inventory of shell eggs, liquid eggs and pork meat already in stock prior to January 1, 2022 need to be discarded if this covered product originated from animals not raised according to the confinement standards of cage-free for hens and twenty-four square feet per breeding pig?"  A. "No. The definition of "confined in a cruel manner" changes at the end of the day on December 31, 2021 for egg-laying hens and breeding

25

pigs. Therefore, the shell eggs, liquid eggs and pork meat already in inventory or commerce on December 31, 2021 will still be legal to sell in California." While this FAQ speaks to the Square Footage Requirements, it does not speak to the Turn Around Requirements.  Defendant CDFA's position is that pork not compliant with the Turn Around Requirements cannot be sold now or after January 1, 2022.  Thus, this sell through allowed for existing inventory that is not compliant with the Square Footage Requirements is meaningless to Plaintiff's members, as only California in-state producers are in compliance with the Turn Around Requirements. Yet, there is confusion amongst Plaintiff's members and the industry.

147.    The Defendants do not have the authority to amend the effective dates of the Act. The effective dates of both the two Proposition 12 requirements can only be changed by a vote of 4/5ths of the legislature, and even that is arguably not possible, as Proposition 12 states that "any amendment of this act shall be consistent with and further the purposes of this act."

148.    As of the date of filing this Complaint, no pending bill exists before the California Legislature to amend the effective date of either the Turn Around Requirements or Square Footage Requirements.

149.    Despite the failure to promulgate the rules, CDFA's ACP informed the public that "with the respect to a delay in enforcement, ACP does not have authority to extend the compliance deadlines provided for in the statute established under Proposition 12 for covered animals and covered products."

150.    Proposition 12 allows for arbitrary, inconsistent, and discriminatory enforcement by Defendants, by other parties, and law enforcement authorities who are left to determine who and when they can prosecute the Act.  Each can proceed without the promulgation of the Final Regulations.

151.    California has failed to cure the unconstitutional vagueness of Proposition 12 with

the promulgation of the rules.  Due to CDFA and CDPH's failure to promulgate the rules as mandated by Proposition 12, and due to the length of time involved in the breeding cycle for sows and the time from farrowing to finish for pork processing, a person of ordinary intelligence does not have adequate notice of or time to comply with either the Turn Around Requirements that CDFA states are in effect now or the Square Footage Requirements going into effect on January 1, 2022.

152.   As a result of CDFA and CDPH's failure to promulgate the Final Regulations as mandated by its own ballot initiative passed by its citizens, Proposition 12 lacks sufficient definiteness and specificity to inform those who may be subject to the law to avoid violating the law or provide persons of ordinary intelligence adequate notice to know what conduct is criminalized and what constitutes a violation of the statute.

153.   Plaintiff's members have a constitutional right to liberty to be free from the risk of imminent criminal prosecution and the consequences of the enforcement of a facially vague law.

## SECOND CAUSE OF ACTION

## VIOLATION OF THE DUE PROCESS CLAUSE (42 U.S.C. § 1983) (FAILURE TO PROMULGATE THE RULES AS MANDATED)

154.   Plaintiff incorporates the facts set forth in Paragraph Nos. 1-153 as though fully set forth herein.

155.   Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiff, including by violating Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

156.   Proposition 12 violates the Due Process Clause because the CDFA and CDPH failed to promulgate the Final Regulations as of the date of this filing as mandated by the Act and required by law.

27

157.    The Turn Around Requirements went into immediate effect on December 19, 2018 and the Square Footage Requirements will go into effect on January 1, 2022 without the mandated promulgation of the Final Regulations or allowing any period of time for Plaintiff's members or the industry to comply.

158.    Proposition 12 mandated CDFA and CDPH to jointly promulgate the Final Regulations for the implementation of the Act by September 1, 2019.

159.    Yet, because the Turn Around Requirements went into effect just six weeks after Proposition 12 passed by ballot initiative, CDFA and CDPH did not have time to promulgate the Final Regulations.

160.    Proposition 12's effective date of December 19, 2018 for the Turn Around Requirements is contradictory to its own mandate to promulgate Final Regulations for the entirety of "this Act," i.e. *both* requirements of the Act, by September 1, 2019.

161.    Proposition 12's Turn Around Requirements went into immediate effect without giving the public, including the Plaintiff, an opportunity to be heard in the required rule and regulation making process.  Proposition 12's Turn Around Requirements also went into immediate effect without allowing time for compliance with the Act or any forthcoming Final Regulations.

162.    The CDFA and CDPH further failed to implement the mandated Final Regulations by the Act's deadline of September 1, 2019.  The deadline passed without CDFA or CDPH even issuing draft Proposed Regulations.

163.    On May 28, 2021, CDFA and CDPH issued draft Proposed Regulations.  On December 3, 2021, Defendants published new, Revised Regulations that they have characterized as "not substantial" changes to the Proposed Regulations.

164.    Comments on the Revised Regulations are due to CDFA on Friday, December 17, 2021. Following the closure of the comment period, CDFA may make additional changes to the

regulations, which can take an indeterminate amount of time. This would necessitate the opening of an additional 15-day comment period. Should CDFA make no changes to the regulations, CDFA will close the rulemaking record.

165.    Upon completion of the regulations and closure of the rulemaking record, CDFA must submit the rulemaking to the California Office of Administrative Law ("OAL") prior to the regulation being effective. OAL has 30 working days to review the rulemaking record to ensure that the requirements of the California Administrative Procedures Act and OAL's regulations are met. If the requirements are met, OAL will file the regulation with the Secretary of State so it can become effective.

166.    Regulations in California only become effective on a quarterly basis. Because the regulations will likely be filed with the California Secretary of State between December 1, 2021 and February 29, 2022 the regulations will not become effective until April 1, 2022 at the earliest. However, it is more likely that the regulations will be filed with the California Secretary of State after February 29, 2022 and will then become effective July 1, 2022 if filed between March 1 and May 31.

167.    CDFA and CDPH failed to promulgate the Final Regulations as of the date of this filing.

168.    On January 1, 2022, just weeks away, Proposition 12's second requirement, the Square Footage Requirements, will go into effect without the required Final Regulations.

169.    Even just for the Square Footage Requirements, California voters approved Proposition 12 with the mandate that an absolute minimum of two years and four months be given to pork producers to comply after the Final Regulations were published.

170.    However, because of the Act's contradictory nature of an immediate effective date of the Turn Around Requirements – and because CDFA and CDPH failed to otherwise promulgate

the Final Regulations by the Act's deadline or even by the Square Footage Requirements' effective date, the entire Act will be in effect without the Final Regulations and without giving Plaintiff's members or the pork industry any time to comply, providing any district attorney, local prosecutor or the Attorney General's Office the authority to enforce Proposition 12 against the Plaintiff's members or those producing and selling meat into California throughout the industry.

171.    The Defendants do not have the authority to amend the effective dates of the Act. The effective dates of Proposition 12 requirements can only be changed by a vote of 4/5ths of the legislature, and even that is arguably not possible, as Proposition 12 states that "any amendment of this act shall be consistent with and further the purposes of this act." Cal. Health & Safety Code 25993.

172.    As of the date of filing this Complaint, no pending bill exists before the California Legislature to amend the effective date of either the Turn Around Requirements or Square Footage Requirements.

173.    Despite the failure to promulgate the Final Regulations, CDFA informed the public that "with the respect to a delay in enforcement, [CDFA] does not have authority to extend the compliance deadlines provided for in the statute established under Proposition 12 for covered animals and covered products."

## THIRD CAUSE OF ACTION

## VIOLATION OF THE PRIVILEGES AND IMMUNITIES CLAUSE (42 U.S.C. § 1983)

174.    Plaintiff incorporates the facts set forth in Paragraph Nos. 1-173 as though fully set forth herein.

175.    Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against IPPA individual members, including by violating these individual members' rights under the Privileges and Immunities Clause at Article IV, Section 2 of

the United States Constitution.

176.    Article IV, § 2 of United States Constitution states "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

177.    The right to pursue a common calling, such as to pursue a trade, practice an occupation, or pursue a common calling within the state is a fundamental right protected by the Privileges and Immunities Clause.

178.    Prior to the passage of Proposition 12, pork producers within California had already been subject to the Turn Around Requirements since 2015 through the enactment of Proposition 2.

179.    Proposition 12 was passed on November 18, 2018, and for the first time targeted out-of-state producers by subjecting them to the onerous Turn Around Requirements and additional Square Footage Requirements in order to sell pork into and within California.

180.    Proposition 12 discriminates against out-of-state producers by immediately prohibiting the sale of whole pork within California that does not comply with the Turn Around Requirements, without providing out-of-state producers with the same six years to come into compliance with these Turn Around Requirements that was afforded to in-state producers.

181.    Proposition 12 thus serves as a proxy for differential treatment and discriminates in practical effect against out-of-state producers.

182.    Proposition 12 further carries a facial discriminatory purpose in avoiding "negative fiscal impacts" to the State of California.

183.    Proposition 12 was designed to take away an economic advantage that out-of-state pork producers had by not being required to comply with the Turn Around Requirements in order to sell whole pork meat into California.  Proposition 12 favors in-state pork producers, who had been subject to Turn Around Requirements since January 1, 2015, and on notice of the Turn Around Requirements since 2008, by giving them an advantage in the California market to continue to sell

31

pork while having a significantly longer time to come into compliance.

184.    Proposition 12, on its face, does not delay the enforcement of the Turn Around Requirements for breeding pigs or their offspring sold within California to out-of-state producers.

185.    Accordingly, Proposition 12 provided no time for out-of-state producers to come into compliance with the Turn Around Requirements allowed to in-state producers.

186.    Sufficient justification does not exist to discriminate against out-of-state producers.

## FOURTH CAUSE OF ACTION

## PREEMPTION BY PACKERS AND STOCKYARDS ACT

## (42 U.S.C. § 1983)

187.    Plaintiff incorporates the facts set forth in Paragraph Nos. 1-186 as though fully set forth herein.

188.    Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiff's members, including by violating Plaintiff's members' rights under the Supremacy Clause at Article VI, Clause 2 of the United States Constitution.

189.    The Supremacy Clause of the United States Constitution provides that the laws of Congress are the "Supreme Law of the Land." A state may not enact a statute that conflicts with a federal law.

190.    A state law conflicts with federal law and thus is preempted when it is not possible for an individual to comply with both state and federal law.

191.    California enacted Proposition 12 on November 6, 2018, which prohibits the sale of meat by any business owner or operator from an animal that was not confined in accordance with Proposition 12.

192.    California pork producers have been on notice since 2008 that they will need to

AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

come into compliance with the Turn Around Requirements.

193.    Out-of-state pork producers are unable to come into compliance and thus will not be able to sell their meat into or within the California market.

194.    Proposition 12 therefore requires business owners and operators engaged in the sale of meat to favor in-state producers who were allowed six years to come into compliance with Proposition 2 Turn Around Requirements.

195.    This favoritism toward California producers will create unfair competition with out-of-state producers, potentially regardless of the price of meat.

196.    The Packers and Stockyards Act, 7 U.S.C. § 192(b) prohibits any wholesaler of meat from providing any preference to a particular locality and from subjecting any particular locality to a "disadvantage" in the sale of meat.

197.    Proposition 12 directly requires wholesalers to favor in-state pork producers and to disadvantage the out-of-state pork producers who have not had as much time to come into compliance with the Turn Around Requirements and now, the Square Footage Requirements.

198.    Thus, it is impossible for a wholesaler to comply with both Proposition 12 and the Packers and Stockyards Act.

199.    At a minimum, Proposition 12 creates hurdles to comply with the Packers and Stockyards Act and Proposition 12.

200.    Further, the Packers and Stockyards Act prohibits wholesalers from taking action that will result in a restraint on Trade, 7 U.S.C. §§ 192 (c)-(e).

201.    By refusing to sell meat from animals that were not confined in accordance with Proposition 12, wholesalers will be engaged in conduct that restrains trade based on the impacts on interstate commerce in the pork industry. These impacts include forcing small businesses out of the market, passing along increased costs to consumers, and reducing the supply of pork meat in the

market.

202.    Proposition 12 is therefore preempted by the Packers and Stockyards Act.

**FIFTH CAUSE OF ACTION**

**VIOLATION OF THE COMMERCE CLAUSE (42 U.S.C. § 1983)**

203.    Plaintiff incorporates the facts set forth in Paragraph Nos. 1-202 as though fully set forth herein.

204.    Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiff, including by violating Plaintiff's rights under the Commerce Clause at Article I, Section 8 of the United States Constitution.

205.    Proposition 12 violates the Commerce Clause, as it includes both a discriminatory purpose and effect.

*Proposition 12 Discriminates Against Out-of-State Producers in Practical Effect*

206.     California enacted Proposition 12 on November 6, 2018, which, for the first time, prohibits business owners and operators from engaging in the sale of whole pork meat from animals confined in a cruel manner, regardless of where the animal was confined.

207.    Prior to the passage of Proposition 12, pork producers within California were already subject to the Turn Around Requirements through the enactment of Proposition 2.

208.    Proposition 12's effect thus unlawfully favors in-state pork producers, who had been on notice of the Turn Around Requirements since 2008, by giving them an advantage in the California market to continue to sell pork while having until 2015 to come into compliance with the Turn Around Requirements.

*Proposition 12's Purpose is to Discriminate Against Out-of-State Producers, and it is Facially Discriminatory*

209.    The Revised Regulations acknowledge Proposition 12 is a protectionist trade barrier

34

with a discriminatory purpose.

210.    For example, the CDFA explicitly noted that, unless out-of-state farmers are required to comply with the confinement requirements as well, "[i]n-state farms will find it more costly to compete with farms outside of the state when selling…whole pork meat to an out of state buyer compared to farms located in states that do not have the same animal confinement standards as described in the Act." 2021 CA REG TEXT 584571 (NS) at 10.

211.    This, combined with one singular stated purpose within the Act to "avoid negative fiscal impacts to the State of California," portrays the discriminatory purpose.

212.    Further, the ballot initiative record was devoid of actual proof that Proposition 12 would actually accomplish the goals it intended (i.e. to protect farm animals from cruel confinement practices, avoid foodborne illness and negate negative fiscal impacts to California).

213.    By California's own admission, Proposition 12 provides no real health or safety benefit to its residents. See 2021 CA REG TEXT 584571 (NS) at 6, 11 ("This proposal does not directly impact human health and welfare of California residents, worker safety, or the State's environment.").

*Proposition 12 Unlawfully Regulates Conduct Extraterritorially and Any Local Benefits are Outweighed by the Burdens Imposed on Interstate Commerce*

214.    The Act and corresponding Revised Regulations directly regulate extraterritorial conduct wholly outside of California by placing onerous certification, registration, and recordkeeping requirements on out-of-state producers to force out-of-state merchant[s] to seek regulatory approval [within California] before undertaking a transaction in California.

215.    Even further, the Revised Regulations also require out-of-state producers to open up their farms—regardless of where in the country they are located—to inspections by California officials and potentially third-party certifiers. The Proposed and Revised Regulations, indicate just

how far beyond California's borders Proposition 12 intends to reach.

216.    The Act itself further targets and regulates extraterritorial conduct through having a direct impact on both the price of pork and the pork consumer, nationwide.

217.    Proposition 12 has other impacts on out-of-state commerce in a manner that wholly regulates conduct that occurs extra-territorially. If Proposition 12 goes into effect, it will have an impact on the national market of pork production, including: decreasing supply, forcing small pork producers out of the market, consolidating pork production into large producers, altering sales in all remaining states to conform to Proposition 12 confinement standards, altering packers' practices to conform to Proposition 12 confinement standards, and ultimately resulting in nationwide increases in the costs of pork meat that will be passed along to consumers nationwide.

218.    In effect, California is forcing the entire nation's pork production chain to adopt its regulations for pork production and is no longer permitting each state to set its own regulatory scheme.

219.    These burdens on commerce, which impact all stages of the pork production market, clearly outweigh any local benefit—which benefit does not exist.

## SIXTH CAUSE OF ACTION

## DECLARATORY RELIEF (CALIFORNIA CODE OF CIVIL PROCEDURE § 1060)

220.    Plaintiff incorporates the facts set forth in Paragraph Nos. 1-219 as though fully set forth herein.

221.    An actual controversy has arisen and now exists between Plaintiff's members and Defendants concerning whether Proposition 12 violates Plaintiff's members' due process rights both facially and as applied as set forth in the First Cause of Action, both under the U.S. Constitution's Due Process Clause and under Article 1, Section 7 of the California Constitution.

222.    An actual controversy has arisen and now exists between Plaintiff's members and

AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

Defendants concerning whether because Proposition 12 is already in effect, and the Square Footage Requirements go into effect January 1, 2022, Defendants' failure to promulgate Final Regulations as mandated by September 1, 2019 violates Plaintiff's members' due process rights as set forth in the Second Cause of Action, both under the U.S. Constitution's Due Process Clause and under Article 1, Section 7 of the California Constitution.

223.    An actual controversy has arisen and now exists between Plaintiff's members and Defendants concerning whether Proposition 12 violates Plaintiff's members' privileges and immunities as set forth in the Third Cause of Action, both under the U.S. Constitution's Privileges and Immunities Clause and under Article 3, Section 1 of the California Constitution.

224.    An actual controversy has arisen and now exists between Plaintiff's members and Defendants concerning whether Proposition 12 is preempted by federal law as set forth in the Fourth Cause of Action, both under the U.S. Constitution's Supremacy Clause and under Article 3, Section 1 of the California Constitution.

225.    An actual controversy has arisen and now exists between Plaintiff's members and Defendants concerning whether Proposition 12 is a violation of the dormant Commerce Clause as set forth in the Fifth Cause of Action, both under the U.S. Constitution's Commerce Clause and under Article 3, Section 1 of the California Constitution.

226.    An actual controversy has arisen and now exists between Plaintiff's members and Defendants concerning Proposition 12 enforcement, as the Defendants' position is that Proposition 12 can be immediately enforced—and the requisite enforcement agencies and private parties have the authority to enforce currently any violations of the Turn Around Requirements; and will have the expanded authority to enforce the Square Footage Requirements after January 1, 2022.

227.    When California voters approved Proposition 12, the statutory text stated that CDFA and CDPH "shall" promulgate regulations by September 1, 2019 for "this Act." Yet, the Turn

37

Around Requirements went into effect almost immediately for out-of-state producers and no time was given to allow for the Final Regulations to be published to guide those "engaged in the sale" of whole pork meat. The voters also clearly contemplated allowing *at least* two years and four months for compliance with Square Footage Requirements by mandating publication of the Final Regulations by September 1, 2019 and not having the Square Footage Requirements effective until January 1, 2022. Yet, California did not promulgate the Final Regulations by September 1, 2019, or even by the date of this filing, and have stated that Final Regulations will not be published by January 1, 2022 when the second provision of Proposition 12, the Square Footage Requirements, now goes into effect.

228.    Given Defendants' failure to promulgate Final Regulations by the statutory deadline, let alone even by the Square Footage Requirement effective date, those affected by Proposition 12, including Plaintiff's members, will not have regulations in place to know what constitutes a violation of Proposition 12, not to mention the two years and four months the voters specifically approved.  The Plaintiff's members—and those they partner with within the supply chain—are left fully exposed against the risk of immediate enforcement of the Act.

229.    Plaintiff's members have no plain, speedy, and adequate remedy in the ordinary course of law.

230.    Plaintiff's members are therefore entitled to a judicial declaration of their rights and the duties of Defendants under Section 1060 of the Code of Civil Procedure.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court set this matter for hearing on a preliminary injunction following review of Plaintiff's separate Motion for Preliminary and Permanent Injunction, and award the following relief:

1.    At a minimum, issue an immediate stay of enforcement of Proposition 12 for a

38

minimum period of two years and four months from the date the Final Regulations are promulgated.

2.     Issue a preliminary and permanent injunction prohibiting the enforcement of Proposition 12, its policies, practices and customs by Defendants, employees and agents, and all persons acting in privity and/or in concert with them (including private enforcers bringing claims pursuant to the Unfair Competition Law or any other applicable law);

3.     Issue an emergency restraining order temporarily enjoining the enforcement of Proposition 12 if the preliminary injunction hearing cannot occur prior to January 1, 2022;

4.     Enter judgment declaring that Proposition 12 and related policies, practices and customs of the Defendants violate the United States Constitution and may not be lawfully enforced, both now and in the future;

5.     Grant Plaintiff reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and Section 1021.5 of the California Code of Civil Procedure; and

6.     Any further relief that the Court deems just and equitable.

Dated: December 16, 2021.

IOWA PORK PRODUCERS
ASSOCIATION,  Plaintiff.

By: /s/ Marnie A. Jensen
Trenton H. Norris (SBN 164781)
Peg Carew Toledo (SBN 181227)
Willis M. Wagner (SBN 310900)
Arnold & Porter Kaye Scholer LLP
Three Embarcadero Center, 10th Floor
San Francisco, California 94111
Telephone: +1 415.471.3100
Facsimile: +1 415.471.3400
Trent.Norris@arnoldporter.com
Peg.Toledo@arnoldporter.com

39

Will.Wagner@arnoldporter.com

and

Marnie A. Jensen (NE 22380)
(*admitted pro hac vice*)
Ryann A. Glenn (NE 26160)
(*admitted pro hac vice*)
HUSCH BLACKWELL LLP
13330 California Street, Suite 200
Omaha, NE 68154
Telephone:  (402) 964-5000
Facsimile:  (402) 964-5050
marnie.jensen@huschblackwell.com
ryann.glenn@huschblackwell.com

and

Eldon L. McAfee (AT0004987)
(*admitted pro hac vice*)
Julie L. Vyskocil (AT0009711)
(*admitted pro hac vice*)
BRICK GENTRY, P.C.
6701 Westown Parkway, Suite 100
West Des Moines, IA 50266
Telephone: (515) 271-5916
Facsimile: (515) 274-1488
eldon.mcafee@brickgentrylaw.com
julie.vyskocil@brickgentrylaw.com

*Attorneys for Iowa Pork Producers Association*

AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

## **VERIFICATION**

I, Pat McGonegle, am the Chief Executive Officer of Plaintiff Iowa Pork Producers Association. I have read the foregoing Verified Complaint for Preliminary and Permanent Injunctive and Declaratory Relief ("Complaint") and am familiar with its contents. I am informed and believe that the matters set forth in the Complaint are true and on that ground allege them to be true.

I declare under penalty of perjury under the laws of the State of California that this verification is true and correct and was executed by me on December 15, 2021, in Clive, Iowa.

Pat McGonegle, IPPA Chief Executive Officer

41

AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY